## Thompson et al. v. Thompson et al.

December 12, 1947.
Rehearing denied May 18, 1948.

Selligman & Greenebaum for appellants.

Allen Dodd, Sr., and Dodd & Dodd for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The case has its origin in a petition filed by the widow of Paul E. Thompson, Sr., and guardian of her two children, against Chester O. Thompson, a brother of her deceased husband, and Paul E. Thompson, Jr., her son who had reached his legal majority. It was

charged that in 1932 Paul E. Thompson, Sr., transferred to his brother Chester O. Thompson, 9,275 shares of stock in the Hart Manufacturing Company, in trust, to be held after disposition of certain claims against him for the benefit of his wife and children. It was also charged in substance and effect that the defendant, Chester O. Thompson, had mismanaged the trust and failed to properly account for the income; and, further, that upon threat of suit for a settlement he had fraudulently undertaken to transfer the trust to Paul E. Thompson, Jr. The petition prayed that the trust be declared void and one-half of the corpus distributed to the plaintiff, as widow, and one-sixth to each of the plaintiff's two children. Disclosure, accounting and recovery of certain sums of money were also sought.

The answer admitted the creation of a trust for the stock described, but stated that it was as a pledge to secure repayment of money advanced by Chester O. Thompson to the Hart Manufacturing Company and Paul E. Thompson, Sr., and when that purpose had been satisfied the stock was to be held for the use and benefit of the three children of Paul E. Thompson, Sr., the wife or widow being excluded.

The deposition of Chester O. Thompson was taken as on cross examination and later in his own behalf, as was some other proof. All of it established the trust for the purposes stated in the answer.

Thereafter, in April, 1942, the widow caused an administrator of her deceased husband's estate to qualify and institute a separate suit. It was alleged that the stock had been pledged to secure Chester O. Thompson against loss, but at the death of Paul E. Thompson, Sr., nothing was owing the pledgee and that the trust was to be administered and managed as a part of the estate of the decedent. The defendant was charged with having fraudulently imposed upon and misrepresented the transaction to his brother's widow and children in several specified respects. The alleged attempted transfer of the trust to Paul E. Thompson, Jr., was stated. Judgment for the voidance of the trust, restitution of the stock, and accounting and recovery of a total of $255,000 was prayed.

The material difference in the two suits, which were

eventually consolidated and proceeded under the style of the later one, is that the first sought recovery by the widow and two children individually and the other by the estate of the decedent. A motion by the plaintiffs to dismiss the first action, except in so far as it affected the administrator's suit, was never acted upon.

The background of the transaction is the failure of the National Bank of Kentucky in November, 1930. The receiver of the bank filed an intervening petition and sought to have the stock subjected to the satisfaction of a balance due on a note owed by Paul E. Thompson, Sr.

There is much detail in the evidence, which took a wide range. It will be seen, however, that the real and ultimate issue is whether the trust after the indemnity purpose had ceased was for the benefit of the three children or was for the widow and three children, for the estate of the decedent is not otherwise concerned.

We leap over other evidence and the deductions from it to say that Paul E. Thompson sought the financial aid of his brother at the time the bank closed. His company was in hard straits. He suffered a stroke which paralyzed his body below the waist two months later. Shortly afterward he agreed to turn over the stock to his brother. He died in January, 1933. Chester O. Thompson assumed the management of the company and it prospered. The widow married in August, 1938. In an effort at harmony, at the request of Paul E. Thompson, Jr., the eldest son, Chester O. Thompson undertook to transfer the trust to him by a formal writing, executed in 1939. Before the determination of this case, all the stock had been sold under authority of the court and without objection by the plaintiffs. They then sought to recover the proceeds. The statement in appellees' brief is not challenged that Paul E. Thompson, Jr., had filed a suit for settlement of his acts as trustee and paid into court cash and securities amounting to $107,234.70 for his sister, and $113,594.39 for his brother.

Disposition may be made, first, of the appeal of the receiver of the National Bank of Kentucky. The court held his claim barred by limitations. It had been asserted more than ten years after the receiver had knowl-

edge of the transfer of the stock. The ruling would seem to be proper; but whether under conditions which the receiver here contends for made it improper or not, the fact that the trial court and we find that the trust was personal to the three children and not made in defraud of the receiver or anybody else, likewise defeats recovery.

The question is purely one of fact. The legality of the trust per se is no longer in issue. Citation of cases dealing with fraud and fraudulent transactions are not necessary. The vehemence which the appellants add to their efforts to bring the case within a class where vicious fraud was found to exist, under the application of several cases, has no place here. On the contrary, the record reveals great benefaction throughout. To review the volume of testimony in detail is likewise unnecessary. The essential and most material and significant are enough.

The story is that Paul E. Thompson, Sr., started out with the Hart Manufacturing Company as a clerk without capital. In the course of time he acquired ownership of the controlling interest in the company and became its president. When the National Bank of Kentucky was closed November 17, 1930, the company owed it $147,000, directly or as endorser of discounted paper. A substantial sum of bonds of the company were also outstanding. Thompson personally owed the bank a note of about $17,000 for stock he had purchased in Banco Kentucky. Chester O. Thompson was a man of means, living in Chattanooga. Much disturbed, Paul called his brother and told him of his financial trouble and his inability to obtain help from other banks. At his request his brother agreed to stand by him. He advanced $15,000 in February, 1931, and considerable sums from time to time thereafter. After Paul E. Thompson suffered the paralytic stroke, he continued to supervise the affairs of his company from his home as best he could. This was in the midst of the financial depression of that era, and the business of the company had become very poor. Chester O. Thompson conducted a money lending company under the name of Chattanooga Finance Company. He owned five-sixths and a sister one-sixth in the firm. The advancements and

loans were made by that company. During 1931, they amounted to as much as $40,000. Paul E. Thompson was personal surety or guarantor.

This was the condition when one or the other brother suggested that the stock in the company owned by Paul should be assigned to Chester to protect his notes, and also to give him control over the affairs of the company. This was about June, 1931. According to Chester, Paul then told him that the stock was not worth anything but if it should ever amount to something he wanted his children to have the benefit of it; that he had taken good care of his wife through an insurance policy, but the children would have nothing. On December 3, 1931, Paul wrote his brother that he was sending him the certificates of stock "assigned over to you as of June 5, 1931, which I have been holding here in Louisville." He suggested that Chester notify the Secretary-Treasurer of the Hart Manufacturing Company "to transfer the certificates into your name as soon as the new stock certificates are ready for issue, about which I explained to you." A second letter of the same day listed the several certificates by number and amount, and added, "I don't think there is any Federal tax on transfer of stock, but will look this up definitely later." In a couple of days Chester advised the Secretary-Treasurer of the assignment of the stock and asked that certificates be issued in his name when the new certificates should be ready. On the same day he wrote Paul acknowledging receipt of the stock, and related his request for new certificates.

On June 5, 1932, Paul E. Thompson, Sr., dictated and caused the following endorsement to be written on the stub of each certificate which he had previously assigned: "This certificate sold and transferred to Chester O. Thompson, Chattanooga, Tennessee, new certificate to be issued upon receipt of new blanks." He then had the Secretary-Treasurer of the company to sign each endorsement.

It may be here said that the Hart Manufacturing Company did not keep a stock register but depended upon the stubs of the certificate book. It had become worn, and the management intended to secure a new book and have the entries transferred. That was done

at a much later date but no new certificates were issued to Chester O. Thompson.

When Paul E. Thompson died in January, 1933, he was survived by his widow, Gertrude, and three children, Paul ,Jr., Virginia and Chester, aged 18, 13, and 8 years, respectively. The widow was the beneficiary in an insurance policy which has paid her $200 monthly, and she had a further income of $20 per month. Their home went to her individually under a survivorship provision of the deed. Thompson's estate was otherwise of little value.

While the balance sheet of the Company during all this time, and particularly when the bank closed, reflected a solvent condition, the company operated at a loss of $8,000 in 1931, and of $23,000 in 1932. On March 14, 1932, Paul E. Thompson, Sr., submitted a statement of his financial condition to the receiver of the bank, in which he listed the stock involved, as his own, with the notation that it was of "unknown or no value at this time." He had borrowed about $5,000 on his life insurance and paid it on his individual note given for the Banco stock, and thereafter made payments of $200 a month for sometime, reducing the principal to around $6,000 when he died. It will be noted that the statement was given the receiver within three months of the endorsements made on the certificate stubs. When he died all debt to Chester O. Thompson or his company had been satisfied. It appears Paul E. Thompson's life was insured for $50,000, for the benefit of his company, and the proceeds were applied on its debts.

Beginning in 1933 Chester O. Thompson caused monthly payments to be made to the widow for herself and children. For awhile she was on the payroll as an employee at $150 a month, but it appears that she was not aware of that fact. When dividends on the stock began to be paid, the advancements were charged up against them. The relationship between the parties was harmonious at all times until about the middle of 1938. Not long before Mrs. Thompson married, in August, 1938, she began to make inquiry concerning what she believed to be additional dividends due her and became suspicious concerning the stock of her late husband. Certain statements and conduct of Chester O. Thomp-

son during the course of seven years preceding, and some afterward, to the effect that he was claiming to be the absolute owner and controller of the stock, were proved. We do not doubt that on several occasions he said that he was the owner. He made a definite representation to the receiver of the bank in December, 1933. All of these statements were the truth, but not the whole truth. The title was in him. But other than these occasional statements he always recognized his brother's family as the beneficial owners. He testified the nature of the ownership of the stock had never been discussed with Mrs. Thompson, except shortly after his brother's death, when they agreed that there was no need for an administrator of his estate. He testified that he told Mrs. Thompson then that she had no interest in the stock, but the children did. She responded that she knew that, as Paul had told her he had given the stock to Chester. Paul Thompson, Jr., testified that shortly after his father's death, his uncle had told his mother the stock was in his name; that he, Paul, was too young to know what it was all about or to think anything about the matter. In later years he ran across the notations on the stock certificate stubs, and his uncle had told him several times that he was trying to make the stock worth something "for the kids." Mrs. Agee testified that Mr. Thompson had told her a few days after the funeral of her late husband that he was the trustee "of the estate and that Paul had left everything in his care." He then made some statements about Paul's debts and that he would pay them out of his own pocket and look to the dividends for reimbursement. C. J. Linton, who was office manager of the Hart Manufacturing Company and in daily contact with Paul E. Thompson at his home when sick and paralyzed, testified that about the time of the assignment of the stock Mr. Thompson told him that he had turned it over to his brother for the benefit of his children. Another trusted employee, Villerich, testified that Mr. Thompson had told him that he had enough insurance to take care of his wife the rest of her life and the children would have to take the gamble with the stock as to whether or not it ever had any value. Thus there is much evidence, both oral and record, that the stock was held for the children exclusively.

Undoubtedly, as time went along and Mrs. Thompson was receiving an income from the company she came to believe she had an interest in the stock, when the records pretty well show that a living for herself and children was being provided and nothing more. She had never heard of the transfer or assignment of the stock, she testified. The only substantial evidence that Mrs. Thompson was a personal beneficiary is the testimony of herself, daughter, and several friends, that in her apartment in Miami, Florida, on one occasion, during the winter of 1936-1937, Chester O. Thompson told her of a proposed sale of the stock, and said: "Gertrude, you will be a rich woman if I sell the stock." She also testified that two or three days after her remarriage, Mr. Thompson referred to the trust as being for the benefit of herself and children, and suggested that as Paul, Jr., was now 23 years of age he should be getting some portion of the estate. These statements were denied or an effort was made to explain them.

Only fragmentary incidents, suspicions and conclusions support Mrs. Agee's claim to the right to share in the stock. After all, they merely disclose the claim of absolute ownership, when all along, and particularly after the breach in friendly relations and before either suit was filed, in letters written by himself and exchange of letters between the attorneys for the parties, Chester O. Thompson always recognized the beneficiary ownership in the children, even as he did from the outset to the end of the extended litigation.

Sifting the large record, of which we have felt it necessary to relate what seems to be only the most significant, the case is resolved into the question of whether the widow was included in the trust. We think the chancellor's conclusion that she was not is well founded.

In appellants' brief much is made of the fact that Chester O. Thompson personally acquired additional stock in the company. The circumstances seem to sustain his contention that he did so for the protection of the trust and the company itself. This has nothing whatever to do with the case as it was resolved. It is also argued that it was wrong for him to have received large increases in salary as president of the company. In the end he was being paid quite a large sum. The

other officers, who had been old friends and associates of Paul E. Thompson, testified that Mr. Thompson "revolutionized" the company by changing its manufactured products and otherwise managing its affairs. He had certainly made the company profitable and the stock valuable. Since the judgment is that the widow had no financial share in the trust, of course, she has no right to question these transactions. As to the two children, the case is not of such form that it brings in issue their right to question them as mere stockholders. It may be added that the elder son, Paul, has taken the position that his uncle's version was right, while the daughter and other son have sided with their mother, although the attitude of all of them has been quite passive.

The judgment is affirmed.